LAVON BUSH-BUTLER,       )
                         )
     Plaintiff,          )
                         )
v.                       )        CASE NO. CV415-212
                         )
MAYOR AND ALDERMAN OF THE CITY  )
OF SAVANNAH,             )
                         )
     Defendant.          )
                         )

## O R D E R

Before the Court is Defendant's Motion for Summary Judgment. (Doc. 15.) For the following reasons, Defendant's motion is **GRANTED**. As a result, Plaintiff's claims are **DISMISSED**. The Clerk of Court is **DIRECTED** to close this case.

## BACKGROUND

This case arises from a curious set of facts. Specifically, Plaintiff—an African-American woman—was terminated from her position as Chief of Staff with the Savannah-Chatham Metropolitan Police Department ("SCMPD") because of a grant application. (Doc. 24, Attach. 1 at 1.) Plaintiff alleges that she was terminated because of race and gender discrimination (Doc. 1), while Defendant alleges that she was insubordinate, untruthful, and failed to follow the chain of command (Doc. 27 at 2-3).

SCMPD Chief Willie Lovett hired Plaintiff but retired in September 2013. (Doc. 24, Attach. 1 at 1.) After Chief Lovett's retirement, the SCMPD made a number of hiring and organizational changes. First, Juliette Tolbert—an African-American woman—was appointed Chief on an interim basis, serving from October 2013 until November 2014. (Id. at 2.) Second, City Manager Stephanie Cutter appointed Terry Enoch as Assistant Chief on an interim basis. (Id.) Third, Plaintiff's job role was modified. While Plaintiff had largely worked for Chief Lovett, Chief Tolbert transitioned Plaintiff to working for Assistant Chief Enoch and Majors Zapal, Branson, Fagerstrom, and Barnwell. (Id. at 3.) Moreover, Chief Tolbert determined that Plaintiff should no longer participate in command staff training and meetings. (Id.) Finally, Chief Tolbert removed Plaintiff—along with numerous other civilian SCMPD employees—from certain email lists. (Id. at 4.) Although Plaintiff complained to City Manager Cutter about these changes, there is no indication that Plaintiff pursued these complaints. (Id. at 5.)

Chief Tolbert also made changes to the privileges that certain civilian SCMPD employees—including Plaintiff—enjoyed. Specifically, Chief Tolbert terminated their ability to take a city vehicle home at night. (Id. at 6.) These employees complained about the loss of their city vehicle privileges with varying results. At least one white female requested to keep her

vehicle but was denied. (Id.) At least one white male—the SCMPD Director of Training—was allowed to keep his take-home vehicle because he had to work evenings and weekends, and traveled for his job. (Id.) There is no evidence that Plaintiff petitioned to keep her car.

Although Plaintiff was displeased with the loss of her car privileges and changes in job expectations, the real trouble started when Plaintiff began to work on a grant application. In 2014, City Manager Cutter determined that the SCMPD should apply for the Byrne Justice Innovation Project Grant. (Id. at 7.) City Manager Cutter reached out to Budget Director Melissa Carter, Chief Tolbert, and Assistant Chief Enoch and encouraged SCMPD to apply for the grant. (Id.) SCMPD assigned Plaintiff, Karen Williams, and Gardenia Campbell to the grant application team. (Id.)

The process of applying for the grant application was fraught with confusion and conflict. City Manager Cutter regularly corresponded with Budget Director Carter and Chief Tolbert regarding the status of the grant application. (Id. at 8.) During these communications, City Budget Director Carter indicated to City Manager Cutter that it was difficult to get information from SCMPD. (Id. at 8.) To alleviate these concerns, Chief Tolbert requested that Plaintiff contact Budget Director Carter. (Id. 1 at 9.) Rather than contacting Budget Director

Carter as requested, Plaintiff provided the relevant information to Chief Tolbert. (Id. at 9.)

The confusion did not end there. Sometime after asking Plaintiff to speak with Budget Direct Carter, Chief Tolbert indicated to Plaintiff that Plaintiff should stop working on the grant application. (Id. at 10.) However, Assistant Chief Enoch spoke with City Budget Director Carter and told that team to continue working on the project. (Id.) Plaintiff apparently continued to work on the grant application.

On May 6, 2014—the day the grant application was due—Plaintiff reported in sick. (Id.) However, Plaintiff continued working on the application from home. (Id.) Slightly before 8:00 p.m., Budget Director Carter sent an email to Plaintiff, City Manager Cutter, Chief Tolbert, and others stating that the grant application had been finalized. (Id. at 11.) At 8:01 p.m., Plaintiff responded to City Manager Cutter, Budget Director Carter, Chief Tolbert, Chief Enoch and others, warning those individuals that the application had actually not been completed. (Id.) Although Budget Director Carter inquired about this confusion, Plaintiff did not respond because Director Carter was not in her chain of command. (Id. at 11-12.) Plaintiff later contacted City Manager Cutter indicating that Plaintiff had finalized the program narrative and abstract. (Id. at 14.) Chief Tolbert also contacted Plaintiff to inquire about

the status of the grant. (Id. at 12.) During the phone call, Plaintiff told Chief Tolbert that Plaintiff was not working on the grant. (Id.) Apparently, this statement was incorrect.

Miraculously, the grant application was submitted despite all of this confusion. After the phone call with Chief Tolbert, Plaintiff emailed City Manager Cutter indicating that the project had been completed. (Id. at 14.) Plaintiff also eventually told Chief Tolbert that the grant had been submitted. (Id.)

Chief Tolbert was displeased with Plaintiff's behavior during the grant applications process. Specifically, Chief Tolbert wanted to know why Plaintiff had said she was not working on the grant when she, in fact, had been. After the application was submitted, Chief Tolbert sent an email to Plaintiff requesting further information on what had happened on May 6, 2014. (Id. at 15.) Plaintiff never responded to this email. (Id.) On May 9, 2014, Chief Tolbert sent a follow up email requesting further information as to Plaintiff's misleading comments. (Id.) Plaintiff responded to this inquiry in person. (Id.) After brief consideration, Chief Tolbert determined that Plaintiff was insubordinate, untruthful, and had violated the chain of command. (Id. at 16.) Accordingly, Chief Tolbert asked Lt. Robert Gavin to conduct an internal affairs investigation into Plaintiff. (Id. at 17.) SCMPD policy would

have usually required Chief Tolbert to conduct the investigation. (Id.)

On November 3, 2014, Plaintiff received a copy of Lt. Gavin's Office of Professional Standards report. (Id. at 18.) At this time, Chief Tolbert's term with the SCMPD was also coming to a close and Joseph Lumpkin became the permanent Chief of Police on November 10, 2014. (Id.) Accordingly, Chief Lumpkin was ultimately responsible for determining Plaintiff's penalty. Chief Tolbert recommended that Plaintiff be terminated and Chief Lumpkin agreed. (Id.) On November 19, 2014, Plaintiff received a notice of suspension prior to dismissal. (Id.) Plaintiff exercised her right to appeal and requested that Chief Lumpkin and the police bureau chief review the investigation and termination. (Id.) While Plaintiff did not dispute her actions, she alleged that she should have received progressive discipline rather than termination. (Id. at 23.) On November 20, 2014, Chief Lumpkin conducted a hearing on Plaintiff's appeal. (Id. at 19.) Chief Lumpkin upheld Plaintiff's termination after Plaintiff "admitted violation[s] of each charged administrative violation." (Id. at 20.) Plaintiff does not dispute that Chief Lumpkin did not discriminate against her on the basis of race or gender, or retaliate against her because she engaged in a protected activity. (Id.) Plaintiff appealed to City Manager

Cutter, who held a hearing and also upheld the dismissal. (Id. at 21.)

Although not included in her statement of facts, Plaintiff also alleges that she was terminated because of her involvement in a race-based harassment complaint. (Doc. 24 at 13.) Roughly a month before Plaintiff's termination, Plaintiff helped Azeezah Sharif file a complaint about racial and threatening statements made by a white male co-worker. (Id.) Plaintiff helped Ms. Sharif send an email, and spoke with Chief Enoch and Major Branson regarding the complaint. (Id. at 14.)

Plaintiff filed this case against the Mayor and Alderman of the City of Savannah on July 29, 2015. (Doc. 1.) Plaintiff alleges that she suffered unequal treatment in the terms and conditions of her employment in violation of the 14th Amendment, retaliation in violation of Title VII, racial discrimination in violation of Title VII, gender discrimination in violation of Title VII, differences in terms and conditions of employment based on race in violation of 42 U.S.C. § 1981, and that the SCMPD was negligent in its hiring and training. (Id. at 7-9.) Defendant alleges that Plaintiff was terminated because she was was insubordinate, untruthful, and failed to follow the chain of command (Doc. 27 at 2-3).

## ANALYSIS

I. <u>SUMMARY JUDGMENT STANDARD</u>

According to Fed. R. Civ. P. 56(a), "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Such a motion must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." <u>Id.</u> The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.' " <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (<u>quoting</u> Fed. R. Civ. P. 56 advisory committee notes).

Summary judgment is appropriate when the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). The substantive law governing the action determines whether an element is essential. <u>DeLong Equip. Co. v. Wash. Mills Abrasive Co.</u>, 887 F.2d 1499, 1505 (11th Cir. 1989).

As the Supreme Court explained:

[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying

those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

Celotex, 477 U.S. at 323 (citations omitted). The burden then shifts to the nonmovant to establish, by going beyond the pleadings, that there is a genuine issue as to facts material to the nonmovant's case. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

The Court must review the evidence and all reasonable factual inferences arising from it in the light most favorable to the nonmovant. Matsushita, 475 U.S. at 587-88. However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Id. at 586. A mere "scintilla" of evidence, or simply conclusory allegations, will not suffice. See, e.g., Tidwell v. Carter Prods., 135 F.3d 1422, 1425 (11th Cir. 1998). Nevertheless, where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment." Barfield v. Brierton, 883 F.2d 923, 933-34 (11th Cir. 1989).

II.  DISCRIMINATION

Plaintiff has brought claims under the Equal Protection Clause for discrimination based on race, Title VII for discrimination based on race and gender, and 42 U.S.C. § 1981

for discrimination based on race. (Doc. 1.) However, the analysis for all of these claims is functionally the same. See Snider v. Jefferson State Comty. Coll., 344 F.3d 1325, 1331 (11th Cir. 2003) ("[W]hen utilized as parallel remedies for such discrimination, the elements of a claim under each are identical."); Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998) (noting that Title VII and § 1981 "have the same requirements of proof and use the same analytical framework"); Flowers v. Troup Cty., Ga., Sch. Dist., 803 F.3d 1327, 1335 n.7 (11th Cir. 2015) ("Though [the plaintiff] brought claims under the Fourteenth Amendment's Equal Protection Clause and 42 U.S.C. §§ 1981 and 1983 as well, their fates rise and fall with his Title VII claim.").

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may establish a claim of unlawful discrimination by presenting direct, circumstantial, or statistical evidence of discrimination. Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir. 1990). Plaintiff's claim is one of disparate treatment based on circumstantial evidence See Raytheon Co. v. Hernandez, 540 U.S. 44, 52 (2003) (quoting Teamsters v. United States, 431 U.S. 324, 335 n.15 (1977)).

Specifically, the SCMPD treated Plaintiff differently based on her race or gender.

To assess a disparate treatment claim based only on circumstantial evidence, the Court employs the framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Burke-Fowler v. Orange Cty., Fla., 447 F.3d 1319, 1323 (11th Cir. 2006). Under this test, a plaintiff must establish a prima facie case of discrimination by proving four elements: (1) she was a member of a protected class; (2) she suffered an adverse employment action; (3) similarly situated employees outside of the plaintiff's protected class were treated more favorably; and (4) she was qualified for the position. Cuddeback v. Fla. Bd. of Educ., 381 F.3d 1230, 1235 (11th Cir. 2004) (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000)). If a plaintiff can demonstrate the elements of a prima facie case, then the burden falls on the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. Alexander v. Fulton Cty., Ga., 207 F.3d 1303, 1336 (11th Cir. 2000). If the employer articulates a legitimate, non-discriminatory reason, the burden shifts back to the plaintiff to demonstrate that the employer's stated reason was pretext. Id. Should the plaintiff fail to establish the presence of a genuine issue of material fact that the employer's reason was

merely pretextual, then the employer is entitled to summary judgment in its favor. Cuddeback, 381 F.3d at 1235. In this case, Plaintiff alleges that she suffered discriminatory termination, loss of privileges, and a hostile work environment.[1]

A. Discriminatory Termination

Plaintiff admits that she cannot show a prima facie case as to discriminatory termination as required by McDonnell Douglas because she was not replaced by someone outside of her protected class and cannot demonstrate that she received less favorable treatment than a similarly situated person not of her race or gender. (Doc. 24 at 30.) Instead, Plaintiff argues that the Court should apply the standard set forth in Quigg v. Thomas Cty. Sch. Dist., 814 F.3d 1227 (11th Cir. 2016). However, Plaintiff is incorrect

As an initial matter, Quigg does not apply to Plaintiff's claims. Quigg involved a school assistant superintendent whom was fired from her position. The superintendent alleged that she was fired because of her race, sex, and gender, but acknowledged that the school board also had a legitimate reason to fire her. Id. at 1232. When there are both legitimate and illegitimate reasons for an action, the action is a mixed-motive claim. Id.

---

[1] It is unclear whether Plaintiff believes her gender or her race caused these actions. For purposes of this order, the Court assumes that Plaintiff believes both were the true cause of the discrimination.

12

The district court granted the defendant summary judgment after concluding that the superintendent was unable to support a claim under the McDonnell Douglas standard. On appeal, the superintendent argued that the district court had used the wrong standard to evaluate her claim of mixed-motive discrimination. Id. The Court of Appeals for the Eleventh Circuit held that courts evaluating claims of mixed-motive discrimination should not use the traditional McDonnell Douglas burden shifting framework. Id. at 1239. Instead, Quigg requires a court evaluating a mixed-motive claim to determine whether the plaintiff "has presented sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that her protected characteristic was a motivating factor for an adverse employment decision." Id. at 1239.

In this case, Plaintiff has not alleged a claim of mixed-motive discrimination.[2] Plaintiff has alleged that she was terminated on account of her race or gender. She has not alleged

_____

[2] Not all race discrimination claims are mixed motive and "[t]he Court has made clear that 'mixed-motives' cases, . . . are different from pretext cases such as McDonnell Douglas and Burdine. In pretext cases, 'the issue is whether either illegal or legal motives, but not both, were the 'true' motives behind the decision.' In mixed-motives cases, however, there is no one 'true' motive behind the decision. Instead, the decision is a result of multiple factors, at least one of which is legitimate." Price Waterhouse v. Hopkins, 490 U.S. 228, 260 (1989) (quoting NLRB v. Transp. Mgmt. Co., 462 U.S. 393, 400 n.5 (1983)).

in her complaint that her race or gender was merely a "motivating factor" in her termination.

Even if Plaintiff had made such a claim, she would still not survive summary judgment. Plaintiff has provided no information whatsoever indicating that race or gender influenced her firing. She has not indicated that any of the individuals who made the decision to fire her considered race or gender. All Plaintiff has alleged is that she was terminated and is an African-American woman. This is simply not enough.

B. Loss of Privileges

Plaintiff also alleges that she suffered additional adverse actions at work. Specifically, Plaintiff alleges that Chief Tolbert "had issues" with Plaintiff, removed Plaintiff's take-home vehicle privileges, restricted Plaintiff's duties, and removed Plaintiff from an email chain. (Doc. 24.) However, these allegations do not present a prima facie case for discrimination based on disparate terms and conditions of employment. First, there is no evidence that either the alleged change of Plaintiff's duties or her removal from an email chain resulted in any tangible harm. See Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1245 (11th Cir. 2001) ("In the vast majority of instances . . . we think an employee alleging a loss of prestige on account of a change in work assignments, without any tangible harm, will be outside the protection afforded by Congress in

Title VII's anti-discrimination clause."). Plaintiff has not alleged that her salary was changed, or that her permanent job tile or classification was affected. See id.; see also Barnhart v. Wal-Mart Stores, Inc., 206 F. App'x 890, 893 (11th Cir. 2006) ("A lateral transfer that does not result in lesser pay, responsibilities, or prestige is not adverse. Likewise, the refusal to give an employee such a transfer cannot be an adverse employment action.") (citations omitted).

Second, Plaintiff has provided no facts to support her allegations that these actions occurred because of her race or gender. Plaintiff neither points to comparator individuals for the removal from the email chain, nor references any race or gender based decisionmaking. Plaintiff does reference two comparator individuals—a white female and a white male—for the loss of her car privileges and one white female for the change in duties. However, Plaintiff has provided little information beyond those individuals' sex and race. Thus, the Court has no way of determining whether these individuals may act as a suitable comparator for purposes of proving discriminatory treatment. See Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1326 n.17 (11th Cir. 2011) ("To be an adequate comparator, the preferentially treated individual from outside the plaintiff's protected class has to be similarly situated to the plaintiff in

all relevant respects.") (citing Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997)).

What little information is provided indicates that the individuals cannot act as comparators for Plaintiff's discrimination claim. Flowers, 803 F.3d at 1340 (11th Cir. 2015) ("Though the comparators need not be the plaintiff's doppelgangers, the 'nearly identical' standard requires much more than a showing of surface-level resemblance."). As an initial matter, Plaintiff provides no factual support for the allegation that her duties were given to a white female. Moreover, the white female employee who Plaintiff alleges kept her city car privileges actually lost them and so suffered the same indignities alleged by Plaintiff. The white male did keep his car. However, he used it for after hours and weekend job related training responsibilities not borne by Plaintiff. (Doc. 27 at 6.) Finally, there is no evidence in the record that Plaintiff sought to keep her car for use in after hours and weekend work.

C. Hostile Work Environment

Plaintiff argues in her motion for summary judgment that she suffered from a hostile work environment. (Doc. 24 at 31.) The Court notes that Plaintiff did not make such a claim in her complaint. Nevertheless, Plaintiff cannot establish a hostile

work environment claim. To establish a hostile work environment claim under Title VII, Plaintiff must prove the following:

> (1) that [s]he belongs to a protected group; (2) that [s]he has been subject to unwelcome harassment; (3) that the harassment [was] based on a protected characteristic of the employee . . . (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002). Disrespectful, unprofessional, and harassing conduct will not suffice to show a hostile work environment unless a link between that conduct and Plaintiff's status in a protected category can be shown. Turner v. Ga. Sec'y of State, 848 F. Supp. 2d 1361, 1381 (M.D. Ga. 2012). An isolated racial comment, without more, does not prove racial motivation for all other conduct. In fact, comments and conduct that do not reference race are generally not considered in a hostile work environment claim. See Reeves v. DSI Sec. Servs., Inc., 395 F. App'x 544, 546 (11th Cir. 2010) ("We do not consider statements or conduct that are unrelated to the [plaintiff's] race.").

The facts of this case satisfy the first element of a prima facie hostile work environment claim as Plaintiff is a member of a protected class. However, Plaintiff's claims do not satisfy the second, third, or fourth elements. Plaintiff has pointed to

no actual evidence of harassment. She has alleged that she was fired, that she was removed from an email list, and that she lost her car privileges. However, these actions, standing alone, are not evidence of harassment based on race.

Even if the actions that Plaintiff alleges did satisfy the second element of a hostile work environment claim, this Court is unable to conclude that Plaintiff experienced harassment that was severe or pervasive. To satisfy this element for a hostile work environment claim, the harassment must be "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998); see also Miller, 277 F.3d at 1276 (noting that the severity requirement has "both an objective and a subjective component"). Courts should consider the totality of the circumstances rather than acts in isolation. Mendoza v. Borden, Inc., 195 F.3d 1238, 1246 (11th Cir. 1999).

A court must evaluate four factors when addressing the objective hostility of the conduct: " '(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance.' " Walton v. Johnson & Johnson Servs., Inc., 347 F.3d 1272, 1285 n.12 (11th

Cir. 2003) (quoting Mendoza, 195 F.3d at 1246). The Supreme Court has held that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 271 (2001) (internal citations and quotations omitted); see also Johnson v. Booker T. Washington Broad. Serv. Inc., 234 F.3d 501, 509 (11th Cir. 2000). In this case, Plaintiff has provided no evidence of racially insensitive comments, behaviors, or actions which she experienced.

With respect to the second factor, the severity of the harassment Plaintiff complains of is insufficient to impose liability on Defendant. The Supreme Court and the Eleventh Circuit have noted that a hostile work environment is only created when the workplace is " 'permeated with discriminatory intimidation, ridicule, and insult,' not where there is the 'mere utterance of an . . . epithet.' " Miller, 277 F.3d at 1276-77 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). Because Plaintiff does not allege that any behavior was physically threatening or particularly humiliating, the Court makes no ruling on the third factor. As to the fourth factor, even if the Court were to conclude that the conduct Plaintiff alleges interfered with Plaintiff's job performance—an allegation Plaintiff did not make—the remaining three factors

all weigh in favor of finding that the conduct Plaintiff experienced was not objectively severe enough to find a hostile work environment.[3]

D. Mosaic Claim

Out of an abundance of caution, the Court addresses whether Plaintiff presented a convincing mosaic of "circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." Smith, 644 F.3d at 1328. Plaintiff's allegations include that there may have been a policy regarding race in hiring decisions in May of 2011, she was involved in a potential claim of discrimination, her termination was recommended a month after that involvement, and some of her

---

[3] Finally, Plaintiff argues that statements by Chief Tolbert and former police Chief Lovett both before and after Plaintiff's termination support her claim of a hostile work environment. (Doc. 24 at 35.) Both statements were made in regards to other hiring decisions and could be read to suggest race based preferences. (Id.) However, "hiring decisions, work assignments, and alleged retaliation claims constitute discrete acts and not acts that are considered part of a hostile work environment." Freeman v. City of Riverdale, 330 F. App'x 863, 866 (11th Cir. 2009) (citing Davis v. Coca-Cola Bottling Co. Consol., 516 F.3d 955, 970 (11th Cir. 2008)). Accordingly, to the extent that Plaintiff attempts to shoehorn these arguments into a hostile work environment claim, she is barred as these claims must be brought individually. Even if Plaintiff had brought such claims, they would fail. "[C]ourts are reluctant to consider 'prior bad acts' in this context where those acts do not relate directly to the plaintiffs." Denney v. City of Albany, 247 F.3d 1172, 1189 (11th Cir. 2001) (citing Earley, 907 F.2d at 1082). In this case, Plaintiff has not pointed to any objective evidence indicating that Plaintiff was affected by the statements made by Chiefs Lovett or Tolbert. Accordingly, Plaintiff cannot support a hostile work environment claim, or indeed any other claim relating to discrimination, on this basis.

20

privileges had been revoked. Even taking the facts in the light most favorable to Plaintiff, there is no evidence of any actionable discrimination against Plaintiff. Accordingly, the Court concludes that Plaintiff has not presented any evidence representing a convincing mosaic of circumstantial evidence. Accordingly, Defendant's motion for summary judgment as to Plaintiff's claims for racial and gender discrimination under the Equal Protection Clause, Title VII, and 42 U.S.C. § 1981 is **GRANTED**.[4]

## II. RETALIATION

Plaintiff also claims that the SCMPD retaliated against her for participating in a protected activity. (Doc. 1 at 5.) Plaintiff alleges that she met with Ms. Sharif—a black female—to help her file a complaint about several racial and threatening

---

[4] The Court notes that Plaintiff's 42 U.S.C. § 1981 complaint also fails because Plaintiff cannot point to any "action pursuant to official municipal policy . . . [which] caused a constitutional tort." Church v. City of Huntsville, 30 F.3d 1332, 1342 (11th Cir. 1994). An official policy is determined by " whether the decision at issue was made by 'those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue.' " Fagerstrom v. City of Savannah, Ga, 2014 WL 11456892, at *2 (S.D. Ga. Sept. 15, 2014) (citing Carter v. City of Melbourne, Fla., 731 F.3d 1161, 1166-67 (11th Cir. 2013) As the official final policy maker in Savannah is the city manager, Savannah may only be liable for her actions. Id. However, as discussed above, Plaintiff has not claimed that the city manager acted with racial animus nor does the city of Savannah have an official policy or custom of racial discrimination. Id. at *3.

comments made in the SCMPD office. (Doc. 12 at 39.) After speaking with Ms. Sharif, Plaintiff spoke in support of Ms. Sharif with Assistant Chief Enoch, and Major Branson, an individual named Sylvia Perry. Plaintiff alleges that she was fired a month after she aided Ms. Sharif. (Doc. 15 at 39.)

As Quigg makes clear, to "prove retaliation, an employee must show that: (1) she engaged in protected activity, such as opposing an unlawful employment practice; (2) she suffered an adverse employment action; and (3) a causal connection exists between the activity and adverse action." 814 F.3d at 1244 (citing Brungart v. BellSouth Telecomm., Inc., 231 F.3d 791, 798 (11th Cir. 2000)). "To demonstrate a causal connection between a protected activity and an adverse employment action, the plaintiff must show that: (1) the decisionmakers knew of [the] protected activity; and (2) the protected activity and adverse action were not wholly unrelated." Harris v. Fla. Agency for Health Care Admin., 611 F. App'x 949, 951 (11th Cir. 2015) (citing Shannon v. Bellsouth Telecom., Inc., 292 F.3d 712, 716 (11th Cir. 2002)). Once a plaintiff makes such a showing, a defendant must show a non-retaliatory reason for its actions pursuant to the burden shifting analysis of McDonnell Douglas. Brown v. Ala. Dep't of Transp., 597 F.3d 1160, 1181 (11th Cir. 2010). If a defendant does provide evidence of a non-retaliatory reason for its actions, the plaintiff is required to show that "

'the proffered reason really is a pretext for unlawful discrimination.' " Brooks v. Cty. Comm'n of Jefferson Cty., Ala., 446 F.3d 1160, 1162 (11th Cir. 2006) (quoting E.E.O.C. v. Joe's Stone Crab, Inc., 296 F.3d 1265, 1272-73 (11th Cir. 2002)).

Plaintiff cannot show a causal connection in this case. Plaintiff alleges that Chief Tolbert knew about Plaintiff's support of Ms. Sharif and points to certain emails suggesting that Chief Tolbert was aware of Ms. Sharif's complaint. (Doc. 15, Attach. 7 at 76, 106.) However, none of these emails indicate that Chief Tolbert was aware of Plaintiff's support of Ms. Sharif. Moreover, Plaintiff admits that Chief Lumpkin had no discriminatory motive against her (Doc. 24, Attach. 1 at 19) and points to no evidence that City Manager Cutter had any discriminatory motive (id. at 22).

Even if Plaintiff could prove causation, Defendant has provided a nonretaliatory justification for Plaintiff's termination. Specifically, Plaintiff was terminated because of her actions in regards to the grant application. Plaintiff has failed to provide sufficient evidence that this nonretaliatory justification was pretext. A plaintiff may make such a showing by citing to " 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' in the proffered explanation." Brooks, 446 F.3d at 1163 (quoting Jackson v. Ala. State Tenure

Comm'n, 405 F.3d 1276, 1289 (11th Cir. 2005)). However, this Court is "not in the business of adjudging whether employment decisions are prudent or fair. Instead [its] sole concern is whether unlawful discriminatory animus motivates a challenged employment decision." Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1361 (11th Cir. 1999) (citing Nix v. WLCY Radio/Rahall Commc'ns, 738 F.2d 1181, 1187 (11th Cir. 1984)). Notably, "[a] reason is not pretext for discrimination 'unless it is shown both that the reason was false, and that discrimination was the real reason.' " Brooks, 446 F.3d at 1163 (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993)). This is accomplished "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Dulaney v. Miami-Dade Cty., 481 F. App'x 486, 490 (11th Cir. 2012) (citations omitted).

Plaintiff has failed to carry this burden. Plaintiff admits that the initial investigation leading to her termination occurred in May of 2014—prior to the Sharif complaint. (Doc. 24 at 14.) Plaintiff also admitted to having engaged in the conduct Chief Tolbert identified as insubordinate, untruthful, and in violation of the chain of command. (Doc. 24, Attach. 1 at 20.) Moreover, Plaintiff has provided no credible evidence that

Defendant was motivated by a discriminatory reason. Thus, Plaintiff's claim must fail because she is unable to show that the reason proffered by Defendant for her termination was false. See, e.g. Chavez v. Credit Nation Auto Sales, LLC, 641 F. App'x 883, 887 (11th Cir. 2016) (concluding that employer's reason for firing was not pretext when employee was fired for sleeping on the clock and plaintiff admitted this conduct).[5] Accordingly, Defendant's motion for summary judgement as to Plaintiff's claims for retaliation is **GRANTED**.

IV. <u>NEGLIGENT HIRING OR TRAINING</u>

Plaintiff also alleges that Defendant was negligent in hiring Chief Tolbert, and failing to hire and train employees on diversity. (Doc. 1 at 9.) However, the doctrine of sovereign immunity bars Plaintiff's claims. The Georgia Court of Appeals has acknowledged that municipalities may not be sued for "[e]mployment decisions, including the retention, hiring and supervision of employees." <u>Doss v. City of Savannah</u>, 290 Ga. App. 670, 675, 660 S.E.2d 457, 462 (2008). Plaintiff's claim involves exactly the same kind of discretionary functions that are shielded from judicial second guessing. <u>Id.</u> Moreover, Plaintiff has neither provided any information indicating a waiver of this immunity nor addressed immunity in regards to

---

[5] Because the Court finds Plaintiff failed to make a prima facie case of retaliatory termination, the Court does not address Plaintiff's "cat's paw theory." (Doc. 24 at 16.)

this claim.[6] Accordingly, Defendant's request for summary judgment as to Plaintiff's claims for negligent hiring and training is **GRANTED**.

## CONCLUSION

Plaintiff's claims are based on race and gender. No matter how sympathetically the Court views Plaintiff's claims, it cannot discern that race or gender affected any of the decisions made in regards to Plaintiff's employment. The Court may not substitute its "business judgment . . . for any other nondiscriminatory reason." Flowers, 803 F.3d at 1330. Accordingly, Defendant's Motion for Summary Judgment (Doc. 15) is **GRANTED** and Plaintiff's claims are **DISMISSED**.[7] The Clerk of Court is **DIRECTED** to close this case.

SO ORDERED this _29th_ day of September 2016.

WILLIAM T. MOORE, JR.
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

---

[6] Plaintiff's sole response to this argument relates to Chiefs Tolbert and Lumpkin and City Manager Cutter's immunity in their individual capacity. (Doc. 24 at 37.) However, Plaintiff filed her claims against the Mayor and Alderman of the City of Savannah and brought no claims against individuals. (Doc. 1.)
[7] Accordingly, the Court does not address whether punitive damages are recoverable in this case.